Case number 2139, I'm sorry, 213195 Joseph Sparksman v. USA et al. Argument not to exceed three minutes per side. Mr. Brown, you may proceed for the appellate. Thank you. Thank you. Good morning, your honors. May it please the court. My name is Jeff Brown and I have the honor of representing Joseph Sparksman, the appellate here, who's the If it pleases the court, I would like to reserve three minutes for rebuttal. Very well. One of the two issues that I would like to discuss here today that relate to one another. It is our position, my position here today, that the district court incorrectly granted summary judgment to the defendant Ambulatory Care Solutions of Ohio in two separate ways. First, by the determination that Mr. Price's claims sounded exclusively as medical claims and that he had no non-medical claims. The second way that the district court erred was by determining that Ambulatory Care Solutions of Ohio could take advantage of a statute of limitations defense. It's that second one that I want to start with. Under the principles of equitable estoppel, as applied in Ohio, and this circuit recently reviewed the state of Ohio law on the principles of equitable estoppel in the case of Archer Cure versus Ming, which was just decided a couple months ago. The way this circuit summarized Ohio's law of equitable estoppel is as follows. In other words, a party cannot state that fact A is true when this view of the world serves his purposes and the other side has relied on this fact, but later state that fact A is false when the opposite view of the world benefits the party in a different situation and harms the other side. That's exactly what happened here. When it served Ambulatory Care Solutions of Ohio, when it served the purposes of that as the VA, it did so and it did so pervasively. What do you, under that logic, it's quite broad, right? There's lots of entities that use the trademark of other entities. Every fast food restaurant, or at least the vast majority of fast food restaurants, are not actually McDonald's. They're franchises, right? If I slip and fall into McDonald's, don't I have some amount of due diligence to figure out which franchise it is? I'm not going to rely on the fact that it just says McDonald's outside. Would your position lead to that conclusion? If not, what distinguishes the VA? What distinguishes that, Your Honor? That's an excellent question. What distinguishes that? As we try to point out in our briefs, Raymond Price was not a stranger in his relationship to the VA. We see the cases that are cited that talk about the concept of constructive fraud that depend a great deal, as this court recognized in Archicure, that silence when he ought to speak out is a component of the concept of constructive fraud. What I would say in the situation where, if on the way home from argument today, I stop in McDonald's and I slip and fall, I have no relationship with them. Certainly not a relationship of trust. We are strangers to one another. No matter how often I eat at McDonald's, I do not have a relationship with them where I put them in a position of trust. They are just serving me hamburgers. However, Mr. Price's relationship with the VA, and that VA clinic specifically, was drastically different than that in two very specific ways. He had a very close relationship with them in two specific fronts. First, he was an American veteran who believed what the VA told him. When they told him, we are the VA, and never told him anything differently. When they told him, quote, we are the VA, help me here. As I read this, it is all about signage and letterheads. That is, there is nowhere where you say, hey, you know, can I sue the VA for, can I sue you for this? And they said, oh, no, we are, can you sue us? We are the VA. They have a sign that says, ambulatory services, a VA facility, which is true. So your constructive fraud, unless you tell me more, is based on these signs and letterheads. Is there anything where these people said, you know, not us, sue the VA. Judge Roberts, a great point. There are two time frames that I would like to talk about and answer to that question. Before the idea of trouble, and I say it very specifically like that, because I think a lawsuit is different. Before the idea of trouble came up, Mr. Price executed an affidavit, of course after the fact as part of the litigation, but an affidavit that related to his entire experience out there at the Belmont County VA Clinic. And as he said, and this is not contested, Ambulatory Care Solutions of Ohio doesn't contend that it told him anything else. Mr. Price swore out an affidavit, the Belmont County VA Clinic calls itself the VA. All of his interactions with them, the way the whole thing was set up. Just to be clear, when he says they call themselves the VA, does he say anything beyond that they have a big sign that says ACS, a VA facility? I think what Mr. Price says in his affidavit is that I think the most important fundamental thing there is that the only reason he was going out there to begin with is because the VA said, Mr. Price, you are entitled to VA health care. Here's where you go. And when you show up out there, everything, it all says it's the VA. Now, after the fact, there is a separate time period there after the fact that I think is critically important and I should be more precise when I say after the fact. Here's what I mean. On October 2, 2015, as we set forth in our pleadings, Mr. Price went out there and there's a sequence of events that bears more in its details on whether or not these are exclusively medical claims. But for the purposes of the equitable estoppel argument, suffice it to say that testing revealed that day that his PSA levels were abnormally high and nobody told him about that for a year. So he goes back there in November of 2016, a little bit more than a year later. So what does Ambulatory Care Solutions of Ohio know at that point? It knows that he had a prior PSA testing that's 13 months old, that's way high. Ambulatory Care Solutions of Ohio also knows that it didn't say anything about that to Mr. Price until right now, more than 13 months later. It also knows... Was that because of their own testing that they were supposed to send to him or was that because of Pittsburgh or something that did the testing and then did not send it to him? At the risk of getting diverted judge-wise, let me answer your question because it is more important to my argument about whether or not these were exclusively medical claims. But now is a good time to talk about that. The sequencing goes, Mr. Price is supposed to, under the ordinary operations of the way ACS of Ohio was doing their business, the ordinary sequencing is he shows up before, days or a week before his annual checkup and has blood drawn. The blood is sent from the Belmont County VA Clinic to the Pittsburgh VA Medical Center where it's tested. The results of that testing are posted to the electronic medical record system to which ACS of Ohio has access down at the Belmont County VA Clinic. And then under the ordinary operation of things, when he showed back up for his annual, the ACS of Ohio people would say, Mr. Price here are your lab results and here are the consequences of those lab results. But that's not what happened here. What happened here is that for whatever reason, there was a failure of ordinary protocol. In October of 2015, Mr. Price did not show up at the Belmont County VA Clinic in advance of his annual to have his blood drawn. As a consequence of that, the ordinary protocols broke down. They drew his blood that very day and it was tested up in Pittsburgh, but not posted until after hours. So under those circumstances, in addition to other things that may be required, it's my contention that all the Belmont County VA Clinic had to do, and they were under an obligation to do it, was to send Mr. Price his test results. He had another doctor. The terminology that the VA uses here is that the Belmont County VA Clinic was secondary. The statute is quite broad. It doesn't say any medical claim. It just says any claim arising out of medical care. Correct. That's like a causation standard. And the entire reason he was getting this test was related to medical care. If he wasn't getting medical care, he would have never gone and got the blood work done. So why isn't it just a natural, why doesn't it related to medical claims? Specifically, Browning v. Berg recognizes that not everything that a hospital or healthcare entity does is medical care. The way we evaluate, that's a standard about whether it's necessary and ancillary, is evaluated under the context of the situation. If you take a look at that Hill v. Wadsworth case, where a patient was being discharged in a determined to be medical claim, but Hill v. Wadsworth is very instructive. What the court found there is by that time, the patient had already been discharged or close to it. There was nothing left clinically to do. That did not fit within a broader delivery of healthcare that that specific patient was receiving. Here, Mr. Price had been discharged, if you want to call it that. He was no longer at the Belmont County VA Clinic anymore. He was home. They had already discharged him. Follow-up care for that condition was not going to be done by the Belmont County VA Clinic. It was going to be done by his other doctors. As we see what happened in November, when they finally said, Mr. Price, your PSA levels are too high. What happened, the VA didn't treat him for that. He went to his outside healthcare providers. So in that sense, simply delivering a lab result through the mail, which is authorized under the policies and procedures, is not medical care. I think the statute is written in a way to try to avoid slicing up the conduct to take out the alleged administrative aspects of medical care from the medical care in order to avoid the statute of limitations. It does say, it has a sub-header that talks about derivative. Because derivative claims are defined under the statute in the more traditional, it says it right in the statute. I don't have the site off the top of my head. But derivative claims are, if they did this to my wife, it doesn't do me any good to say, I'm not your patient. So these aren't my claims against you, these are medical claims. Derivative claims are defined just that way in 2305.113. To get back to answering Judge Barr's question, that when he comes back, I think one of the issues here that's very important and unique, I've never seen anything like it. Because of the way Ambulatory Care Solutions of Ohio and the VA hold themselves out, I think the influence here clearly is that the VA understands what they're doing. They're leading veterans to believe they're getting VA medical care. So they put it right in contract with Ambulatory Care Solutions of Ohio. If something goes wrong here, if there are adverse consequences to this care, you have to help these patients understand how to request compensation for their injuries. It's right in the contract. I've never seen anything like it. Where part of the contractual obligations that ACS of Ohio took on here was that if there are adverse consequences to this, I don't have the language memorized, you have to help the patient understand how to request compensation for their injuries. So that's where I think we are in a different factual scenario than almost any other. Here the claim was filed with the VA within the time frame. Correct. Maybe they should have told him earlier, should have found out. But he was within the time frame. VA, after some period of time, says, not us, fellas. So at that point, he's still got a month or so. And then it just slips and he waits three months. What the ACS of Ohio had to tell Mr. Price at that point is... At that point, meaning when the VA had denied it? No. Your Honor, I'm sorry. When they realized they forgot to tell this guy for a year about his PSA scores. And now his PSA scores are higher than they even were before. I got that. At that point under the contract, and in addition to the general law of equitable estoppel, given their relationship with Mr. Price, at that point they had to say something along the lines of, we've told you up until now that we're the VA and that will lead you to file an administrative claim with DVA. But that's not what you need to do now because we are not really the VA. I know we've been telling you that, but we are not really the VA. There's no indication that he ever asked any of that. So the constructive fraud was, in your view, being silent when they knew they had an oopsie. That is, that they didn't know he would necessarily sue. But that sort of, here's your results, and by the way, if you want to sue, don't sue the VA. I think without putting... Is that what the constructive fraud... Partially, Your Honor. Partially, but it's more than that too. Because by February of 2017, that Belmont County VA clinic gets a letter from me. So now they know all the things that they've known before, and they get a letter from me. They don't respond to that, but what they do, they take an affirmative act, they pass it on to the VA. Now that may be because they're required to do it, but that's what they do. So when the records bounce back to me, they don't come from Ambulatory Care Solutions of Ohio. They come from the VA on VA letterhead, and nowhere in those records does it say, does it even suggest or hint that there might be independent contractors involved with this. All right, Mr. Brown, you're out of time. You can use your three minutes rebuttal now, or you can save it. No, thank you, Your Honor. I'll save it. Thank you. Let's hear from the counsel for the appellee. Good morning. Good morning, Your Honors. May it please the Court, my name is Melvin Davis, and I represent Ambulatory Care Solutions of Ohio. So I want to start by saying, really, the facts of this case as it pertains to the equitable estoppel and equitable tolling matters, they're not unique, and they're not novel. The underlying facts are pretty well known that these VA clinics throughout the country can be staffed by independent contractors. What you really have here is a party that just did not take advantage of the information that was readily available. An example of this is attached to Mr. Price's complaint, there are VHA directives. Those VHA directives weren't obtained through discovery, they were obtained because of public and it says they may be either VA or VA staffed or contract staffed. It is no secret that throughout the country that there are VA clinics that utilize independent contractors to provide medical care. So what the case law says is that you can't just turn a blind eye to it, you have to actually exercise due diligence. Now, what do you make of the argument that because the contract imposed an obligation on you to essentially confess to negligent conduct or at least say, well, there might be something going on here, here's how you sue us, do you think that that contract could somehow create a duty to disclose so that would take it outside my earlier McDonald's hypothetical and suggest because you disclosed to patients how to sue if potential misconduct came about, your silence could be part of the equitable estoppel equation or the misrepresentation part of it? Yes, so I would disagree for several reasons. I would disagree, one, because that is purely a contractual duty, that's not a duty that would be owed in tort and Mr. Price has confessed that he's not suing for a breach of contract and unless it was an independent duty owed outside of the contract, he can't take advantage of that. But the other problem with that argument is that there's no evidence in the record that interprets that contract language to say that it actually did impose a duty even under the contract to disclose that ambulatory care institutions of Ohio had employed individuals because what the language says is that when there's an unanticipated outcome, there's no evidence as to what is considered an unanticipated outcome because you have to also keep in mind that there's different levels of care and different types of care being provided at the facility. So it's one thing, for instance, someone goes for podiatry and- But not telling somebody that his PSA is 50 times what it should be would seem to be an unanticipated outcome in common parlance, wouldn't it? So medically, and we didn't get to this in the case, so the PSA test levels let you know that there's an indication. It doesn't actually create the cancer. The cancer is independent. And there's also no evidence that the ambulatory care solutions of Ohio even would have known because they didn't know until November 2016 when they related to them. They gave them the They don't know that he goes and he gets diagnosed with metastatic cancer. And so there's no evidence in the record to suggest that that triggered a duty to say something or even when it says to let them know their means of compensation, but what does that mean? What routes of compensation? These aren't lawyers. And so we're really left to a scenario where there's just assumptions as to what this contractual meant. But again, I don't think we even get there because this isn't a breach of contract claim. And even with all that being said, there were other options and there were other avenues available for Mr. Price to know that these individuals were employed. So for instance, when the letter was sent for the medical records, which in a statement was made that ACS of Ohio affirmatively passed it along, but there's no evidence in the record to suggest that. There's no evidence in the record that ACS of Ohio actually ever read the contents of the letter, that they got the letter, that it didn't go as part of the mailing to VA PHS. So again, that's not in the records. But what we do know is that in that letter, there was nothing in it that says, please provide me the identity of all entities involved in the care of Mr. Price. There was no inquiry that was contained within the letter. And now I want to address because in my colleague's argument, there's this constant use of the word of they told him, they, they, they. It is not very specific as to they. And so when the example was given that a party can't say fact A is true, what there isn't in this case is any evidence that ACS of Ohio made any representations to Mr. Price. Instead, everything is said is that the VA said, the VA did, the VA. I would suggest that if the argument is that the VA made some misrepresentations, and I'm not saying that how the argument would have played out, but I think it would have been more appropriate to make those equitable arguments against the VA. It's the party that makes the representations. And so what the case law does not allow is for a party that did not make the representations to somehow be bound equitably by the actions of another party. So the representation is essentially a sign outside and the other uses of the VA trademark. How do we go about deciding who made those representations? So one, the signage issue was mandated by the VA pursuant to the contract. And it's also not really, it's not inaccurate. The facility is a VA facility. The issue is who employed the medical providers that provided the care to Mr. Price. And we, there was an affidavit, not everyone in that clinic was employed by ACS of Ohio. There were other, like a psychologist who was employed by the U.S. government. The issue is just that the care providers, and in particular, the nurse practitioner was employed by ACS of Ohio. So even the signage is not a misrepresentation. And this court has confronted similar issues in the Witsley decision where you had the exact same scenario. It was involving the Navy. They followed the administrative claim as required under the Federal Tort Claims Act and then discovered that the physician was a contracted physician. And this court held the statute of limitations still applied because you can't sit idly by. In order to invoke the equitable doctrines, you have to take an affirmative action and you have to show due diligence. And that just didn't occur in this scenario. Now, the issue with whether or not it's a medical claim, the court is correct, is very broad, is whether or not it arises out of medical care. And courts in Ohio have already held that the failure to provide diagnostic testing does arise out of medical care. And you can't split up the medical claim and try to, after the fact, parse it into a non-medical, ordinary negligence cause of action to avoid the statute of limitations. Can I ask you about the case law that excludes from the scope of cases in hospitals? I would ostensibly think that the language is broad enough to cover those types of situations. If I'm actually at the hospital because of medical care and I slip and fall, you would naturally say it's a claim that arises out of medical care, potentially. But the cases come out the other way. And my question is, where do they draw the line, in your view, in the text of this provision that would distinguish your case from the slip and fall cases? Well, because I would think that in a slip and fall case, my reading of the law is because the slip and fall, for instance, is caused by a spill. And the spill has nothing to do with medical care. It's something that would happen even in a Walmart or a store, in that the courts say that it's completely unrelated and separate to the medical care. I would arguably say it arises out of the medical care if the person who slips and falls is at the hospital to get medical care, because it's a but-for-cause relationship. So there has to be some type of, is it an atextual limit on the scope of the statute? And if so, why shouldn't that atextual limit cover this situation of just failing to put a paper in the mail? So as a defense attorney, I would love for it to say if there was a slip and fall that that would fall under the medical claim. But I understand that it doesn't. So what I'm trying to figure out is how does the text draw this line? How do the courts draw a line in the text to distinguish those cases from your case? Is it just atextual? They just think, well, that would happen at the Walmart or it could happen at the Walmart. So it's too attenuated. Is there maybe a proximate cause test or something? So the way I see the test is like in a slip and independent that the actual injury itself. And so specific to a diagnostic test though, for instance, one, it comes out of the very purpose of why Mr. Price goes. The only reason he's getting the test is for medical purposes. And it also does require more than just ordinary layperson knowledge. Because let's say if they had just mailed the test results to Mr. Price, quite frankly, that's malpractice. Mr. Price doesn't have the education to be able to read the test results and understand what they mean. So there has to be, and it's actually pled in the complaint, that the failure wasn't just to give him the test results, but it was also a failure to explain to him what it meant and what he needed to do next. And all of that falls under medical because only a medical professional could do that. So for instance, I break my arm, I go to the hospital, and they don't just give me an x-ray and say, hey, see you Melvin, have a nice day. The x-ray itself means absolutely nothing to me. I need someone with medical training and an understanding to explain to me, this is the fracture, this is what's recommended, this is how you treat it, and to give me some sort of explanation. And so the idea that all that was required is to just put the test results in the mail is, quite frankly, is a fallacy. Because if he had received his test results and no one told him anything, he would have filed a complaint and said, hey, you gave me these PSA test levels, I don't know what these numbers mean, I didn't do anything about it, you owe me a duty to explain it. And by the way, again, the argument that it was not a medical claim only came after the fact. Because if you look at the complaint, there's nothing in the complaint, there's no cause of action that's specific to some sort of administrative failed to mail it. And even the expert reports that were later provided all said that the duty was not just to mail it, but also to explain it to him. And so what the courts try to do in fashioning these cases is to avoid a party circumventing the statute of limitations by just trying to convert a medical claim into ordinary negligence. And that's what's happening in this scenario. Any further questions, Judge Boggs? No. Thank you. Thank you, your honors. Brown, you've got three minutes rebuttal. Thank you, your honor. Judge Murphy, I'd like to address, I think, a very important point that you brought up about how do Ohio courts delineate this? Where it would seem that if you just read that statute, literally anything that happened in a hospital would be considered related to or arising out of medical care. And the way the courts draw that distinction is really twofold. The first is the context under which that ancillary care was rendered. Was it rendered as some sort of ongoing larger medical issue? So for example, if I'm being transported from the roll cart to the surgery table for open heart surgery, I'm in the hospital and this is part of core medical care. Where in the Hill v. Wadsworth case, she was on her way out the door. She was already being discharged. And the other factor beyond context is whether or not the action requires some degree of skill. That's the language that we see up here. Some degree of professional skill is required to execute the thing that we're talking about here. And again, I think it's important to emphasize, Mr. Price's blood is tested in Pittsburgh. It's posted to a computer, accessible in Belmont County. All that has to happen now, given that Mr. Price has another doctor, is for those results simply to be transmitted to him so that he can bring them to his other doctor. I think that the USA's interrogatory response that is included here about how the situation failed shows that. Under what ordinarily would happen to be two-pronged, delivery of test results and explanation. But they had already fallen down on that. They were already outside their own procedure. So now it's simply a matter of communicating the test results. And I think it's also important at that point to understand, when we get into the contract, it literally reads, patients and when appropriate their family are informed of all outcomes of care, treatment and services, including any unanticipated outcomes. They will be informed about how to request compensation for injuries. And so by the time Mr. Price comes back, I think Judge Boggs, as you appropriately pointed out, his PSA was way high and now it's even worse. That is clearly an unanticipated outcome. And to the extent that it's not, to the extent that ACS of Ohio takes the position, look these are just numbers on a piece of paper, who knows what they mean. They might not necessarily be an unanticipated outcome. I think that just goes to show why these might not be medical claims at all. If the delivery of a raw number doesn't mean anything, who knows what it means. It's not an unanticipated outcome. And that just sort of bolsters the point that the transmission of that number is not in and of itself medical care. And with that said, subject to any further questions of the court, I appreciate your time, Your Honor. Thank you very much.